


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

GEORGE CUNNINGHAM,

Plaintiff,

vs.

MONSANTO COMPANY,

Defendant.

Case No. 3:13CV490 TSL-JMR

Demand for Jury Trial

**CLASS ACTION COMPLAINT**

Plaintiff George Cunningham, on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendant Monsanto Company ("Monsanto") and states as follows:

**INTRODUCTION**

1. Plaintiff is a wheat farmer in Humphries and Yazoo County, Mississippi. He brings this suit because, like thousands of wheat farmers across the country, he has lost money and his livelihood is now at significant risk as a result of Monsanto's negligence or gross negligence.

2. For nearly a decade commencing in 1998, Monsanto tested genetically engineered wheat ("GE Wheat") in fields across the country. It did so knowing full well that release of its experimental seeds into the general wheat population could result in the loss of huge domestic and export markets. Neither the United States nor its trading partners have approved GE Wheat

for human consumption. Mixing GE Wheat into non-genetically engineered wheat could make the latter unsalable.

3. In April 2013, an Oregon farmer discovered a strange strand of wheat growing where no wheat had been planted. He applied an herbicide to kill the strand. Shocked when the herbicide proved unsuccessful, he sent the wheat to a lab. There, scientists discovered that the wheat was actually Monsanto's GE Wheat—altered to be herbicide resistant. Worldwide markets responded to the news swiftly. One day after the media reported the news of the discovery of Monsanto's GE Wheat in unsegregated fields, Japan and South Korea suspended certain U.S. wheat imports. And in the United States, futures prices posted steep declines.

4. Due to Monsanto's conduct, GE Wheat has been released into the non-genetically modified wheat population. Farmers like Plaintiff have been injured significantly as a result as the price for their wheat drops and markets close previously open doors. On his own behalf and on behalf of similarly situated farmers, Plaintiff seeks damages for the injuries caused by Monsanto.

## PARTIES

5. Plaintiff George Cunningham is a Mississippi wheat farmer who resides in Holmes County, Mississippi and operates in Humphries and Yazoo Counties Mississippi.

6. Monsanto is a Delaware corporation with its principal office and headquarters at 800 North Lindbergh Boulevard, Saint Louis, Missouri 63167. Monsanto is an agricultural company in the business of developing, manufacturing, licensing and selling agricultural chemicals, other agricultural products and agricultural biotechnology.

7. The "original Monsanto" was founded in 1901 to manufacture the synthetic sweetener saccharin. By 1945, it was actively involved in producing and marketing agricultural

chemicals and other agricultural products. Monsanto also has a lengthy history with agricultural biotechnology. Scientists working for the original Monsanto were the first to genetically modify a plant cell in the 1980s. In 1987, the original Monsanto began conducting the first U.S. field trials of plants with biotechnology traits in 1987; and, by 1994, the first biotechnology product of the original Monsanto received regulatory approval.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(d)(2) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq*.

9. Venue is proper in this Court under 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and this is where the property at issue is situated.

## FACTUAL ALLEGATIONS

### A. Despite Significant Risks, Monsanto Attempts to Develop GE Wheat

10. In or around 1998, Monsanto entered into a business endeavor to develop new technology in the wheat industry consisting of new varieties of wheat through developing, planting, and testing experimental, unapproved genetically modified wheat that Plaintiff has come to know as glyphosate-resistant GE Wheat[1] following its discovery on an Oregon farm in 2013. Plaintiff has learned that Monsanto developed, planted and tested GE Wheat from approximately 1998 to 2005. Since Plaintiff is unaware of all of the different "GE" designations assigned to the experimental, unapproved genetically modified wheat, Plaintiff shall refer to Monsanto's genetically modified wheat throughout this Complaint as "GE Wheat," "glyphosate-

[1] In its May 31, 2013 "Updated: Monsanto Statement on USDA GM Wheat Report" found on its website, Monsanto refers to the presence of the "Roundup Ready gene." http://www.monsanto.com/newsviews/Pages/monsanto-statement-on-usda-gm-wheat.aspx (last accessed on June 5, 2013).

resistant wheat" and/or "genetically modified wheat." Plaintiff has been harmed by any and all of Monsanto's GE Wheat because it has impacted wheat exports and the price of wheat.

11. The Animal and Plant Health Inspection Service ("APHIS") is an agency of the United States Department of Agriculture ("USDA") responsible for protecting animal health, animal welfare, and plant health. APHIS is responsible for regulating any and all field trials of genetically modified crops according to the Plant Protection Act ("PPA") codified at 7 C.F.R. § 340, *et seq*. GE Wheat is not currently approved or authorized for commercial sale or planting in any country.

12. The idea behind Monsanto developing genetically modified lines of wheat was that wheat farmers battle problems with weeds and wild forms of wheat that negatively affect their production and profit. Monsanto developed GE Wheat and other genetically modified lines of wheat that have a genetically modified protein that allegedly makes the wheat plant resistant to glyphosate, a broad-spectrum herbicide wheat farmers can apply to their crops to kill weeds known to compete with commercial crops without the concern of harming their actual wheat crop. For example, Monsanto's Roundup is a glyphosate-containing herbicide product.

13. From approximately 1998 to 2005, Monsanto conducted over 100 field tests for its herbicide resistant seed. Monsanto planted its GE Wheat in fields across the United States, including but not limited to Arizona, California, Colorado, Florida, Hawaii, Idaho, Illinois, Kansas, Minnesota, Montana, Nebraska, North Dakota, Oregon, South Dakota, Washington and Wyoming. Monsanto stored, planted, farmed and/or tested GE Wheat in Oregon. GE Wheat has always been in the exclusive control, or should have been in the exclusive control, of Monsanto and its agents.

14. Monsanto's ultimate goal was profit – to develop and sell to wheat farmers a genetically modified variety of glyphosate-resistant wheat along with Monsanto's glyphosate-

containing herbicide product systems, the most common of which is Roundup, thus controlling a substantial part, if not all, of the United States wheat market. In turn, Monsanto would have a monopoly on the United States wheat market that would reap Monsanto potentially billions of dollars.

15. Following field trials of GE Wheat, Monsanto decided not to commercially market any of its genetically modified wheat and never submitted it to the relevant federal agencies – APHIS, USDA, and/or the Environmental Protection Agency ("EPA") – for commercial approval. Monsanto realized that United States consumers, along with the European and other world markets, did not demand, or even want, genetically modified wheat. As a result, GE Wheat was never approved for cultivation, sale, or human consumption in the United States.

16. Monsanto also knew that there was a high risk that the genetically modified wheat that was being tested could contaminate other varieties of wheat on Oregon property as well other farms in Oregon by other means. Specifically, Monsanto knew that wheat is a cross-pollinating plant. As such, Monsanto knew that GE Wheat stored, planted, and/or tested on Oregon property and any other property in the United States was likely to cross-pollinate with marketable, non-genetically modified wheat varieties, thereby contaminating these non-genetically modified varieties, permanently mutating them and forever modifying their genetic make-up making the wheat unmarketable. Monsanto failed to keep proper safe zones between fields and failed to utilize other measures such as tarps to prevent the genetically modified wheat from escaping the test areas and cross-pollinating and thereby contaminating fields that were supposed to only contain non-genetically modified wheat.

17. Monsanto also knew or should have known that GE Wheat could contaminate the non-genetically modified seed wheat including but not limited to in the following ways: 1)

Monsanto's failure to prevent birds and/or other natural elements such as wind from transporting genetically modified wheat to fields that were supposed to only contain non-genetically modified wheat to be sold as seed wheat; 2) Monsanto's use of equipment on fields where genetically modified wheat was being planted/grown/tested and then using the same equipment on fields that were supposed to only contain non-genetically modified seed wheat thereby transporting genetically modified wheat and contaminating the supposedly non-genetically modified seed wheat fields; 3) Monsanto's failure to prevent commingling of genetically modified wheat with non-genetically modified wheat during harvest, transport, storage and processing; and 4) contamination caused by volunteer wheat issues. Wheat that voluntarily germinates and develops the year or years after it is initially planted is referred to as "volunteer wheat." Applied here, Monsanto was aware of volunteer wheat issues.

18. Despite the preceding facts, Monsanto and its agents or employees planted and tested genetically modified wheat on property across the United States. On those same fields, Monsanto knew or should have known that its agents or employees or other farmers would then farm non-genetically modified wheat for the purpose of growing seed wheat to sell to wheat farmers and seed companies that Monsanto knew would ultimately be planted by farmers for commercial wheat production. Monsanto altogether failed to take proper precautions and/or to prevent the co-mingling of its genetically modified wheat with genetically modified wheat and/or volunteer genetically modified wheat from germinating, maturing, developing and contaminating what was sold and represented to farmers and seed companies as non-genetically modified seed wheat.

19. Moreover, Monsanto never properly informed or disclosed to any wheat farmers, including Plaintiff, that GE Wheat was being stored and/or grown on Oregon soil or anywhere

else in the United States. Monsanto failed to inform Plaintiff and Mississippi wheat farmers that seed wheat could be or likely was contaminated with genetically modified wheat. Monsanto purposely withheld this information because it knew the impact GE Wheat, that it controlled or owned, would have on the wheat market/industry if the public was made aware of the contamination.

**B. Discovery of Monsanto GE Wheat in Unsegregated Fields**

20. To the best of Plaintiff's knowledge, the contamination of the U.S. wheat supply with Monsanto's glyphosate-resistant gene was first discovered in or around April 2013 by an Oregon farmer who noticed some volunteer wheat plants, plants that had germinated and developed in a place where they were not intentionally planted, in his wheat field. After discovering the wheat plants, the Oregon farmer attempted to eradicate them by spraying them with Monsanto's RoundUp glyphosate weed killer. Remarkably, the plants survived the herbicide application.

21. The Oregon wheat farmer sent samples to a scientist at Oregon State University ("OSU"). The samples were received on April 30, 2013. The scientist at OSU tested the samples and based on preliminary tests, the samples tested positive for a glyphosate-resistant trait.

22. The OSU scientist contacted APHIS on May 3, 2013. APHIS immediately began a formal investigation into the situation that included, among other things, dispatching investigators onsite to investigate how this situation occurred and collecting additional samples from the farm in Oregon. On May 29, 2013, APHIS made the public announcement about this detection as soon as USDA laboratories had absolute confirmation regarding the specific GE glyphosate-resistant wheat variety.

**C. Discovery of Monsanto GE Wheat Sends Worldwide Wheat Markets into Turmoil.**

23. The next twelve months were looking up for this nation's wheat farmers. In November 2012, U.S. Wheat Associates, the nation's international wheat marketing assistance organization, predicted an increased demand in the global wheat markets due to weather issues in Argentina, Russia, and the Ukraine. Vince Peterson, vice president of overseas operations for U.S. Wheat Associates stated that the 2012-13 marketing year would provide tremendous opportunity for U.S. wheat exports due to the global weather concerns. With many key competitors unable to provide wheat to their traditional customers, Peterson anticipated the second half of the marketing year would allow the U.S. to export 31.3 million metric tons. The discovery of Monsanto's GE Wheat in unsegregated fields brought an end to such optimism. Farmers are now facing sharply declining prices and outright bans on the importation of their wheat in foreign countries.

24. Once the public became aware of the contamination related to Monsanto's GE Wheat (commonly referred to in the industry as "GMO contamination"), the response in the wheat markets was swift and negative, thereby damaging the value of Plaintiff's wheat crop and thus the value of the land itself.

25. According to the Washington Post on May 30, 2013:

> Japan, the largest market for U.S. wheat exports, suspended imports from the United States and canceled a major purchase of white wheat on Thursday after the recent discovery of unapproved genetically modified wheat in an 80-acre field in Oregon. The report rattled U.S. wheat markets. In addition to Japan's action, the European Union, which imports more than 1 million tons of U.S. wheat a year, said that it was following developments 'to ensure E.U. zero-tolerance policy is implemented.' It asked Monsanto to help detection efforts in Europe.

26. South Korea also suspended imports of U.S. wheat according to Reuters on May 31, 2013:

> South Korean millers suspended imports of U.S. wheat on Friday and some Asian countries increased inspections after the discovery of the unapproved wheat, but stopped short of imposing import bans.

27. As a direct consequence of the acts and omissions of Monsanto with regard to its experimental, unapproved genetically modified glyphosate-resistant wheat, Plaintiff has suffered damages, including but not limited to loss of revenue relating to the drop in the price of wheat occasioned by the discovery of Monsanto's GE Wheat, economic loss relating to the lack of availability of suitable export markets, and economic losses related to increased farming expenditures resulting from the discovery of GE Wheat.

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings these claims against Monsanto, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), individually and on behalf of a class consisting of:

> All persons and entities in the United States who grew, owned, cultivated, harvested, priced, and/or planted wheat from May 29, 2013, to present. Excluded from the Class are the Court and its employees; Monsanto; any parent, subsidiary, or affiliate of Monsanto; and all employees and directors who are or have been employed by Monsanto during the relevant time period.

29. Plaintiff reserves the right to amend this class definition prior to class certification.

30. Plaintiff seeks to represent the class for any damages and injunctive relief.

31. The Class is so numerous and geographically dispersed among numerous wheat-growing states that joinder of all members is impracticable. The exact number and identity of Class Members is not known. Plaintiffs believe that at least thousands of persons cultivated and/or harvested wheat during the relevant time period and would be members of the class. Accordingly, Rule 23(a)(l) is satisfied.

32. Common questions of fact and law exist here, as required by Rule 23(a)(2), including but not limited to:

a. Whether Monsanto is liable to Plaintiffs and the other members of the Class for damages, and the proper measure of such damages;

b. The manner in which Monsanto's GE Wheat came to contaminate non-genetically engineered wheat;

c. Whether Monsanto field tested GE Wheat in such a manner that commingling with non-genetically engineered wheat was reasonably foreseeable;

d. Whether Monsanto was negligent in its supervision of field testers who oversaw the testing program affiliated with GE Wheat from 1998 to 2005;

e. Whether Monsanto was negligent in the testing, growing, storing, transport and disposal of GE Wheat;

33. Plaintiff's claims are typical of the other Class Members' claims and do not conflict with the interests of any other Class Members, as Plaintiff and all Class Members were damaged by Monsanto's wrongful conduct, and the relief Plaintiff seeks is common to the relief sought on behalf of the Class. Rule 23(a)(3) is thus satisfied.

34. Plaintiff will fairly and adequately protect the interests of the other Class Members and has no interests that are antagonistic to or which conflict with those of other Class Members. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent him and the members of the Class. Rule 23(a)(4) is thus satisfied.

35. Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions

could be brought by individual farmers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated farmers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Monsanto. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(l).

36. Monsanto has acted and/or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby rendering class certification and injunctive and/or declaratory relief with respect to the Class as a whole appropriate as well. Certification under Fed. R. Civ. P. 23(b)(2) would, therefore, be appropriate.

37. As discussed above, numerous common questions of fact and law exist. These questions predominate over the individual questions presented in this action. The predominance requirement of Rule 23(b)(3) is thus satisfied.

38. A class action is the superior method for the fair and efficient adjudication of this controversy, because joinder of all Class Members is impracticable. The expense and burden of litigation would prevent Class Members from individually redressing the wrongs done to them. A representative class action is both the appropriate vehicle by which to adjudicate these claims and is essential to the interests of justice. Furthermore, a class action regarding the issues in this Court creates no significant problems of manageability. The superiority and manageability requirements of Rule 23(b)(3) are thus satisfied.

39. Alternatively, a class action is appropriate under Rule 23(c)(4)(A) with respect to particular issues.

## CLAIMS FOR RELIEF

**COUNT I: NEGLIGENCE**

40. Plaintiff incorporates by reference the foregoing paragraphs.

41. Monsanto owed legal duties to Plaintiff that it breached proximately causing damage to him. First, Monsanto had a duty to prevent injury to Plaintiff when it reasonably appeared or should have appeared that in the exercise of his lawful rights as a product manufacturer and its agent, it created a dangerous condition when creating, testing, handling and storing GE Wheat as described above. Second, it had a duty to exercise reasonable care to avoid a foreseeable risk of injury to Plaintiff and/or a duty to take affirmative action to control or avoid increasing the danger from the improper creation, design, and testing of GE Wheat that was/were created by its conduct. Third, Monsanto also had a duty to use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiff. Fourth, it had a duty to exercise reasonable care in performing services that it should recognize as necessary for the protection of Plaintiff and his property. As a product manufacturer and its agent, Monsanto had a duty to use ordinary care in the design, testing, handling and storing of GE Wheat to protect Plaintiff from unreasonable risk of harm. Monsanto failed to use ordinary care in the design, testing, handling and storing of GE Wheat. The negligent design, testing, handling and storing was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

42. Monsanto further had a duty to design, test, handle and store GE Wheat in a manner that would not cause harm or injury to Plaintiff. Monsanto failed to adequately design, test, handle and store GE Wheat or to take appropriate steps to prevent the damage described above. Monsanto's negligent testing was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

43. A product manufacturer and its agents have a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product. A violation of this duty is negligence. Monsanto violated its duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of GE Wheat to Plaintiff. The inadequate warnings were a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

44. Monsanto further undertook the duty to properly instruct and train those who tested, used, handled, studied, transported, stored, planted and harvested GE Wheat. A product manufacturer and its agent have a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by him. A violation of this duty is negligence. Monsanto failed to properly instruct and train those who tested, used, handled, studied, transported, stored, planted and harvested GE Wheat. Monsanto's failure to do so was a proximate cause of the harm to Plaintiff. Monsanto is liable for all damages to Plaintiff proximately caused by its actions.

**COUNT II: NEGLIGENT UNDERTAKING**

45. Plaintiff incorporates by reference the foregoing paragraphs.

46. Monsanto had a duty to act carefully in its testing of GE Wheat, whether the testing was for profit or gratuitous, and should have recognized that its failure to exercise reasonable care in the testing of GE Wheat could result in harm to Plaintiff. Monsanto knew its failure to exercise reasonable care in the testing of GE Wheat increased the risk of harm to Plaintiff and failed to exercise reasonable care which proximately resulted in damages to Plaintiff.

47. Monsanto's negligent undertaking proximately caused damages to Plaintiff.

## COUNT III: GROSS NEGLIGENCE

48. Plaintiff incorporates by reference the foregoing paragraphs.

49. Monsanto's conduct described above was more than momentary thoughtlessness or inadvertence. Rather, Monsanto's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff. Monsanto had actual, subjective awareness of the risk involved but, nevertheless, proceeded in conscious indifference to the rights, safety or welfare of Plaintiff.

50. At the time it tested GE Wheat, Monsanto knew that wheat can be a cross--pollinating plant. Monsanto also knew that wheat in the test fields in 1998 through 2005 was likely to cross-pollinate and/or contaminate by other means, non-genetically modified wheat varieties and land, thereby reducing their value by rendering these wheat crops unmarketable or less marketable. Further, Monsanto knew that scientists since the early 1970s had warned of the danger of contamination of genetically modified organisms in the biotechnology field and that specific precautions had to be taken to prevent the release of genetically modified organisms into the environment. Monsanto intentionally ignored these concerns.

51. At that time and through the present-day, Monsanto also knew that non-genetically modified wheat can become contaminated with genetically modified wheat through a wide variety of means including but not limited to cross-pollination, natural events/creatures transporting the contaminated genetically modified wheat from field to field, farm equipment used on a field unknowingly contaminated with genetically modified wheat and then used on a field with non-genetically modified wheat thereby transporting the genetically modified wheat and contaminating the non-genetically modified field, commingling during harvest, transport, storage and/or processing, and volunteer wheat contamination.

52. Monsanto also knew that due in part to added costs relating to the segregation of wheat, to insufficient storage capacity, and to the fact that many U.S. grain elevators, storage, and transportation facilities are simply not set up to test and segregate wheat, it could not reasonably expect that those facilities would or could segregate wheat and keep GE Wheat out of the general wheat supply. Monsanto also knew that once GE Wheat contaminated the general wheat supply in the U.S., such contamination would significantly disrupt the storage, transportation, distribution and marketing of wheat, cause significant added costs to wheat farmers, and detrimentally impact the market price for wheat.

53. Despite this knowledge, Monsanto failed to take adequate, reasonable and necessary precautions to prevent the contamination of the wheat supply with GE Wheat. Monsanto's acts and omission have caused significant harm to Plaintiff resulting from the GMO contamination, as set forth in the preceding paragraphs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of all others similarly situated requests that the Court enter judgment against Monsanto, as follows:

(a) That the Court certify the Class pursuant to Rules 23(a), 23(b)(2), and 23(b)(3), and designate the Mr. Cunningham as the representative of the Class;

(b) That the Court adjudge and decree that Monsanto is liable to Plaintiff and the members of the Class for Plaintiff's causes of action;

(c) That the Court order Monsanto:

(1) To pay compensatory and consequential damages;

(2) To pay exemplary and punitive damages;

(3) To pay the costs of this action, including attorneys' fees and expenses;

(4) To pay pre- and post-judgment interest;

(5) To allow Plaintiff and the Class to amend these pleadings to conform to the evidence produced at trial;

(6) To grant Plaintiff and the Class such other and further relief, both at law or in equity, to which Plaintiff and the Class may be justly entitled.

**REQUEST FOR TRIAL BY JURY**

Plaintiff requests a trial by jury.

Respectfully submitted,

BY: Don Barrett

Don Barrett, MSB #2063
David McMullan, Jr., MSB #8494
Brian K. Herrington, MSB #10204
Katherine B. Riley, MSB #99109
Sterling Starns, MSB #104277
Don Barrett, P.A.
404 Court Square North
P.O. Box 927
Lexington, MS 39095
T: (662) 834-2488
F: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
bherrington@barrettlawgroup.com
kbriley@barrettlawgroup.com
sstarns@barrettlawgroup.com